HARTMAN BANKRUPTCY LAW
GREGORY S. HARTMAN, SBN: 252941
1300 Clay St., Suite 600
Oakland, CA 94612
(510) 227-5325
email: Gregory@BayAreaRestructure.com

Attorney for Creditor, Delta Metal (Holdings) Limited

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In Re:<br>ACCESS METALS TRADING, INC.,<br>Debtor in Possession | Case No. 22-40887 WJL<br>Chapter 11, Subchapter V<br><br>MOTION TO CONVERT CASE TO CHAPTER 7 OR TO REMOVE DEBTOR IN POSSESSION; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Date: May 3, 2023<br>Time: 10:30 a.m.<br>Court: U.S. Bankruptcy Court<br>1300 Clay St., Rm 220<br>Oakland, CA; and via<br>Telephonic/Video |

Creditor, Delta Metal (Holdings) Limited ("Delta"), through counsel, respectfully moves this Court for entry of an order converting the above-captioned case to a case under chapter 7, pursuant to §§ 105(a) and 1112 of title 11 of the United States Code (the "Bankruptcy Code"), or in the alternative to remove Access Metals Trading, Inc. (the "AMT" or "Debtor") as the debtor in possession, pursuant to § 1185 of the Bankruptcy Code.

This motion is based upon the motion, the memorandum of points and authorities, the notice of motion, and accompanying declaration of Gregory S. Hartman, filed herewith.

In support of this motion, Delta respectfully represents as follows:

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 1 of 25

# MEMORANDUM OF POINTS AND AUTHORITIES

## <u>INTRODUCTION</u>

**1.**     AMT commenced this case to halt multiple lawsuits against AMT by suppliers, customers and joint venture partner, Fusion Metals Limited ("<u>Fusion</u>").

**2.**     AMT proposes to reorganize its affairs through a chapter 1l plan, utilizing future earnings to fund the reorganization, based on historical and post-petition financial performance.  Mr. Scott Ehrlich ("<u>Mr. Ehrlich</u>") is the owner of the company and designated Responsible Individual.

**3.**     AMT's case has been pending for approximately six (6) months.  While a Chapter 11 Plan has been filed, no confirmation hearing has been scheduled.

**4.**     During the pendency of this case, Delta has discovered countless material financial inaccuracies, the largest of which are detailed herein.  At present, Delta is aware of at least four separate legal bases on which to either convert this case under § 1112(b) or to remove the Debtor in Possession under § 1185.

## <u>Mismanagement & Incompetence</u>

**5.**     AMT has mismanaged the affairs of the Debtor both before and after the filing of this case.  Prior to the bankruptcy, in both 2020 and 2021[1], AMT overstated revenue by millions and likely reflected profits which never existed.  AMT did this by double booking sales and purchase transactions, thereby grossing up both revenue and costs of goods sold and reflecting fictitious profits which had no corresponding cash receipts.  Only after this was exposed in the 2004 examination of Mr. Scott Ehrlich did AMT finally acknowledge the inaccuracy of its historical records.  During the drafting of this Motion, after six months in bankruptcy, AMT finally amended its Statement of

---

[1] 2021 appears to be the last year of viable operations for AMT, with sales transactions for the most part ceasing in late 2021.

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 2 of 25

Financial Affairs, *reducing* 2021 revenue by *$3,521,090* and *2020* revenue by *$2,087,598*.

    6.      After the Petition Date, AMT modified its accounting records, effectively preventing Delta, Fusion and the Trustee from investigating pre-petition insider financial transactions.  In actuality, AMT did more than modify its accounting records but appears to have created new accounting records.  Along the way, AMT conveniently lost the ability to either track the changes it made to its accounting records, or to produce its original accounting records.  This constitutes either dishonest conduct, or gross incompetence and mismanagement of the estate.

    7.      Post Petition, AMT has also satisfied more than $106K in unscheduled pre-petition debts, relating to pre-petition deposits from customers (i.e. unsecured creditors), with whom AMT has continued to do business post-petition.  AMT's satisfaction of these debts was neither disclosed, nor approved by this Court.  This constitutes either dishonest conduct or gross incompetence and mismanagement of the estate post-petition, each of which constitutes cause for conversion or removal of AMT as the debtor in possession.

**Conflicts of Interest**

    8.      The balance on an insider loan owed by AMT to Mr. Ehrlich has fluctuated dramatically in the years preceding the bankruptcy filing.  The balance owed on this insider loan was in large part the object of AMT's alterations to its accounting records, post-petition.  From December 31, 2019 to the Petition Date, the balance owed on this loan has fluctuated from as low as $76K to as high as $2.33M, depending on which of AMT's business records are examined.  Considering the inaccuracies within AMT's accounting records, as well as AMT's propensity to alter those records, a close and objective examination of insider loans is needed, yet AMT is hopelessly conflicted

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 3 of 25

on this matter. By altering its accounting records, AMT has thwarted creditors and the Trustee's attempts to investigate these transactions. This constitutes either dishonest conduct or gross incompetence and mismanagement of the Debtor and the estate, each of which constitutes cause for conversion or removal of AMT as the debtor in possession.

**Dishonesty**

9.      Based on AMT's accounting records and Mr. Ehrlich's own testimony, it seems apparent AMT has inflated the value of its Accounts Receivable as of the Petition Date. The facts and timing of events support the conclusion that this was done to benefit Mr. Ehrlich personally. Though entirely undisclosed in AMT's Bankruptcy Schedules, Mr. Ehrlich is the personal guarantor on the $250K secured loan from Umpqua Bank ("Umpqua"). Inflating the value of Accounts Receivable ensures Umpqua would be paid the bulk of its claim by the bankruptcy estate, thus eliminative the vast majority of Mr. Ehrlich's personal liability on this debt. In furtherance of this objective, AMT amended its Schedules and Mr. Ehrlich filed a Declaration attesting to asset values which are simply untrue. This represents both a manifesting conflict of interest, as well as dishonest conduct by and for the benefit Mr. Ehrlich, personally. This constitutes further cause to convert this case or remove AMT as the debtor in possession.

**Continuing Loss / Diminution of Assets / No Viable Rehabilitation**

10.      AMT has recorded a sizable loss during every single month of this case, as reflected in AMT's Monthly Operating Reports. These operating results would appear at odds with AMT's historical profitability, except for the fact we now know AMT's financial statements have grossly overstated revenue and profits. AMT's post-petition lack of profitability makes clear that no rehabilitation is feasible. AMT's own post-petition operations provide a particularly clear basis on which to convert this case.

## JURISDICTION

11.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

1     **12.**     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2     **13.**     The statutory bases for relief are sections 105(a), 1112(b), and 1185,

3 FRBP 2002 and 1017, as well as Bankruptcy Local Rule 9014-1.

4 **BACKGROUND**

5 <u>Bankruptcy Filing</u>

6     **14.**     AMT is in the scrap metal business, purchasing scrap metal from recycling

7 centers and scrap yard collection facilities in North America, South America, and Asia.

8 AMT notes as a precipitating cause of its bankruptcy filing, in essence, that it sold goods

9 to customers but was never paid on those sales.

10     **15.**     Delta is an unsecured trade creditor and customer of AMT, with primary

11 business operations out of Hong Kong. Delta holds a claim of $223,252, related to

12 deposits paid by Delta for scrap metal shipments which were never received. After

13 pursuing payment for more than a year, Delta eventually retained domestic counsel and

14 commenced a state court proceeding under claims of breach of contract.

15     **16.**     Prior to AMT's bankruptcy filing, AMT was also sued by multiple metal

16 suppliers, as well a foreign joint venture creditor, Fusion. Pursuant to the Claims

17 Register in this case, aggregate non-insider claims total $2,910,161, comprised of:

| # | Creditor | Amount | Asserted Status |
|---|----------|--------|-----------------|
| 1 | ACME Iron & Metal (Vendor) | $51,900 | Unsecured |
| 2 | BMW Financial (Vehicle) | 10,821 | Secured |
| 3 | IRS (Tax) | $9,000 | Priority |
| 4 | Umpqua Bank | $252,534 | Secured |
| 5 | M. Litsitz & Co. (Vendor) | $150,400 | Unsecured |
| 6 | Behr Iron & Metal, c/o Euler (Vendor) | $124,340 | Unsecured |
| 7 | City National Bank | $60,827 | Unsecured |
| 8 | Franchise Tax Board (Tax) | $822 | Priority |
| 9 | Fusion Metals Limited & Edwin Chow (JV) | $2,026,265 | Unsecured |
| 10 | Delta Metal (Holdings) Limited (Customer) | $223,252 | Unsecured |

*See* Claims Register.

## ARGUMENT

**The Court Should Convert the Case to Chapter 7, or in the Alternative, Remove the Debtor in Possession.**

Section 1112 of the Bankruptcy Code provides that "a court shall convert a case under this chapter to a case under chapter 7, or dismiss a case under this chapter, whichever is in the best interests of creditors of the estate, for cause." 11 U.S.C. § 1112(b)(1). Section 1112(b)(4), sets forth 16 grounds which constitute "cause," and includes, but is not limited to, the following:

> (A) substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (B) gross mismanagement of the estate;
> . . .
> (E) failure to comply with an order of the court;
> . . .
> (H) failure to timely provide information …. requested by the United States trustee (or the bankruptcy administrator, if any)[2][.]

This list in not exhaustive, and a case shall be dismissed or converted for other causes, such as bad faith, or for example if the petition does not serve a bankruptcy purpose. *In re Jayo*, 2006 WL 2433451, *6 (Bankr. D. Idaho, July 28, 2006) ("In [the Ninth] Circuit, the court has discretion to consider alleged causes not specifically listed in § 1112(b)"; *See also In re Ameribuild Constr. Mgmt., Inc.,* 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009) ("The list contained in §1112(b) 'is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases'." (quoting H.R. Rep. No. 95-595 at 405-06 (1977)).

In addition, Delta proposes as an alternative to conversion that the Court should remove AMT as debtor in possession under §1185. Section 1185(a) of the Bankruptcy

---

[2] [Code Section 1116(7) Duties of trustee or debtor in possession in small business case: "In a small business case, a trustee or the debtor in possession, in addition to the duties provided in this title and as otherwise required by law, shall – (7) allow the United states trustee, or a designated representative of the United States trustee, to inspect the debtor's business premises, books and records[.]

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 6 of 25

Code provides that:

> On request of a party in interest, and after notice and a hearing, the court shall order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case

"The grounds for removal of a subchapter V debtor in possession also closely align with the grounds for removal of a chapter 11 debtor in possession in a non-subchapter V case pursuant to section 1104(a)(1) with the exception that 1104(a)(a) adds 'or similar cause'[.]"  8 *Collier on Bankruptcy* ¶ 1185.01 (16th Ed., 2022).[3]  In the instance a subchapter V debtor in possession is removed, an existing trustee's duties are expanded pursuant to § 1183(b)(5), operating more akin to a chapter 11 trustee appointed under § 1104.  *Id.*

Many of the factual assertions which would support conversion of a case to chapter 7 also appear to support removal of a debtor in possession.  "Obviously, there is substantial overlap between §1104(a)(1) and the factors determining whether the court should, under § 1112(b)(1), convert or dismiss for cause." *In re TP, Inc.*, 455 B.R. 455 (Bankr. E.D. N.C. 2011);  *See also In re Vaughan*, 429 B.R. 14 (Bankr. D. N.M. 2010) (finding debtor's refusal to explain, among other things, prepetition transfers and failure to file accurate schedules as cause to appoint a chapter 11 trustee or for conversion).  In this case, most of the facts established herein would support *either* conversion or removal of the AMT as the debtor in possession.  Delta explicitly prefers conversion to chapter 7.

## A.   Gross Mismanagement Before and After the Petition Date

### 1.  Debtor's Records are Materially Inaccurate & Have Been Altered

On or around December 1, 2022, both Delta, and Trustee Christopher Hayes (the "Trustee") began requesting accounting records from AMT – specifically General Ledger detail – in order to examine pre-petition QuickBooks transactions which aggregate into Debtor's historical financial statements.  AMT never voluntarily produced these

---

[3]  Also absent from §1185 is the second grounds under § 1104(a)(2), where appointment of a trustee would be in the "best interests of creditors, any equity security holder and other interest of the estate." *11 U.S.C. § 1185.*

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 7 of 25

documents.  *See* email exchanges between Delta, Trustee, and the Debtor, at **Ex.1** and **Ex. 2** to the contemporaneously filed Declaration of Gregory S. Hartman In Support of this Motion (the "<u>Hartman Decl.</u>").  Along the way, Delta explicitly raised concerns that AMT appeared to be altering its accounting records, and objected to distortion of the original accounting transactions.  *See* email exchange at **Ex. 2**.  Delta was forced to obtain an Order for Rule 2004 Examination and to Produce Documents,[4] entered by the Court on December 8, 2022 (the "<u>2004 Order</u>").  A true and correct copy of the 2004 Order[5] is attached as **Ex. 3** to the Hartman Decl.  Pursuant to the 2004 Order, among various documents, Debtor was required to produce several years of historical General Ledger detail and Financial Statements.  To Delta's disappointment, accounting records finally produced by AMT were materially altered from what was filed with the Petition.  *See* email exchange, a true and correct copy of which is attached as **Ex. 5** to the Hartman Decl.  And while AMT has acknowledged that it changed its accounting records, AMT now asserts that it can no longer produce the accounting records as they existed on the Petition Date.  *Id.*  What is *most surprising* however, is that AMT appear to have gone to the extraordinary lengths of creating new records, going back at least as far as December 31, 2019 - the earliest date for which AMT was required to produce accounting records under the 2004 Order.

      i.   *How We Know AMT's Accounting Records Have Been Altered*

It is also fairly straight forward to see that AMT's original financial statements are not the same as those filed as of the Petition Date.  This can be done simply by comparing a set of financial statements produced as of the Petition Date with those produced pursuant to the 2004 Order.  Bankruptcy Code § 1116(1) requires a debtor to "append to the voluntary petition . . . (A) its most recent balance sheet, statement of

---

[4] Trustee Hayes and the U.S. Trustee have sought to be, and have been, included as recipients on all documents produced under Delta's 2004 Orders.

[5] Delta expanded the scope of document production slightly, via a supplemental Rule 2004 Order on 12/19/2022 at Doc. No.73 (attached as **Ex. 4** to the Hartman Decl.), and similarly obtained an Order for oral examination of the Debtor on 1/30/2023, at Doc. No.92.

operations [i.e. a Profit & Loss], … and Federal income tax return." 11 U.S.C. §1116. This gives us a starting point for comparison: The July 31, 2022 Balance Sheet, filed with AMT's Petition at Docket No. 1 (the "Original Balance Sheet"). A true and correct copy of the Original Balance Sheet is attached as **Ex. 6** to the Hartman Decl. This Original Balance Sheet would have been produced from AMT"s accounting records which existed at the time the case was filed on September 12, 2022, and is the source document to which we compare subsequently produced financial statements. Pursuant to the 2004 Order, AMT later produced four additional Balance Sheets from its accounting records, dated as of: 9/12/2022, 12/31/2021, 12/31/2020 and 12/31/2019 (respectively, the 9/12/22 B.S., 12/31/21 B.S., 12/31/20 B.S., and 12/31/19 B.S.; and collectively, the "New Balance Sheets"). True and correct copies of the New Balance Sheets are attached to the Hartman Decl. as **Ex. 7**, **Ex. 8**, **Ex. 9** and **Ex. 10**, respectively. A comparison of the Original Balance Sheet to any of the New Balance Sheets makes clear these were not generated from the same accounting records.

<u>Original Accounting Records vs. New Accounting Records</u>

Both the *balances* and the *names* of various liability accounts have changed, the classification of the insider loan to Mr. Ehrlich (current vs long-term), as well as the balance of prior-year's Retained Earnings. In addition, AMT's new set of books is reflects a different *company name* (i.e. the name of the QuickBooks file). Below is table highlighting the details evidencing the changes:

| | **Original 7/31/2022 Balance Sheet**<br>(Ex. __, Original Balance Sheet) | **Altered Balance Sheets**<br>(Ex. __, 9/12/2022 B.S.) |
|---|---|---|
| **Company / File Name** | **"ACCESS METALS TRADING, INC"** | **"Access Metals Trading, Inc."** |
| Current Liability Accounts | "Note Umpqua-Line of Credit" | "Note Umpqua-LOC" |
| | [None]<br>$0 | "FA Global -Joint Venture"<br>$769,354 |
| | [None]<br>$0 | "JV -Joint Venture"<br>$31,606 |

| | | "Note Payable Ehrlich" $551,068 (on 9.12.22) |
|---|---|---|
| Long Term Liability Accounts | "Note Payable Stockholder – Scott Ehrlich"   $1,487,548 | [N/A] |
| 2022 Retained Earnings/ <Deficit> Prior Years | <1,142,116> Accum. <Deficit> as of 12/31/21 | <$998,714> Accum. <Deficit> as of 12/31/21 |

Mr. Ehrlich acknowledges that AMT's accounting records have been altered[6] during the pendency of the case, identifying and confirming both accounts and account balances which have been changed since the Petition Date.  A true and correct copy of the Scott Ehrlich Examination Transcript ("Ehrlich Transcript") is attached as **Ex. 11** to the Hartman Decl.; (*See* 40:24 – 46:22; 47:15 – 50:10).  Furthermore, Mr. Ehrlich identified and confirmed that the newly created accounts are now reflected in the accounting records going back to at least 2019 – meaning AMT 's accounting records have changed going back at least this far.  *Id* at 50:11 – 53:12;  54:9 – 56:14;  58:17 – 59:13.   AMT has also acknowledged that it needs to amend its tax returns.[7]  *Id* at 59:14 – 60:11.

Such material inaccuracies in a debtor's financial records clearly reflect mismanagement pre-petition, as does the need to amend pre-petition tax returns.  Recreating years' worth of accounting records, while failing to maintain any sort of record of these changes constitutes post-petition mismanagement, at a minimum.

### 2.  *The New Accounting Records Are Still Materially Inaccurate*

While AMT asserts that changes to its accounting records were necessary to correct past mistakes, the new records remain *materially* inaccurate.  Delta focuses herein on the most significant misstatements.

#### i.  *Revenue:  Double Counted and Grossly Overstated*

---

[6] Mr. Ehrlich prefers the term "changed" to the term "altered," though this seems to be mostly an issue of semantics.  *Id*. at 35:2 – 22.

[7]  Considering accounting misstatements go back multiple years, it is unclear just how many years need to be amended, and when such amended tax returns will actually be filed.

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 10 of 25

For months, Delta (and the Trustee) have been seeking explanations with regards to exceedingly large journal entry transactions impacting total revenue in years 2020 and 2021. Two specific Adjusting Journal Entries ("AJEs") reflect exceeding large adjustments to revenue in both 2020 and 2021. True and correct printouts of AJEs #4568 and #4558 are attached as **Ex.12** and **Ex. 13**, respectively, to the Hartman Decl. These AJEs are reflected as follows:

**2021 AJE #4568**

| | |
|---|---|
| Zorba[8] [Revenue] | $4,431,699 |
| Purchases-Zorba [Costs of Goods Sold] | $4,035,948 |
| FA Global -Joint Venture[9] [Current Liab. -reduction] | $395,751 |

*See also* the 2021 General Ledger report ("2021 G/L") at **Ex. 14**, pp. 27, 30 and 23;

**2020 AJE #4558**

| | |
|---|---|
| Zorba [Revenue] | $3,313,273 |
| Purchases-Zorba [Costs of Goods Sold] | $2,699,519 |
| FA Global -Joint Venture [Current Liability] | $841,467 |
| Purchases-Zorba [Costs of Good Sold -reduction] | $227,712 |

*See also* the 2020 General Ledger report ("2020 G/L") at **Ex. 15**, pp. 30, 35 and 27;

Both AJEs can be traced (as highlighted) into AMT's General Ledger detail. In effect, each transaction grosses up revenue and costs of goods sold by millions of dollars. In a typical transaction however, the difference between revenue and costs of good sold would yield a net cash increase equivalent to the gross margin. But what is highly unusual here is that the gross margin is actually booked as a *reduction* to a *liability* account. As a percentage of revenue, both theses AJE's reflect 50% or more of AMT's total revenue in each of the respective years. *See* 2021 Profit & Loss, and 2020 Profit & Loss, attached as **Ex. 16** and **Ex. 17,** respectively, to the Hartman Decl.

For months, Delta informally and formally sought explanation and documentation in support of these large AJEs. *See* email at **Ex. 5**; *see also* [Supplemental] 2004 Order

---

[8] Zorba refers to a type and quality of recycled metal.

[9] The FA Global -Joint Venture account reflects a [new] current liability account in which AMT purports to record and track the amounts owed to Fusion under the joint venture with Fusion.

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 11 of 25

at **Ex. 4**, p. 2. Not until the 2004 oral examination of Mr. Ehrlich did AMT finally purport to explain the basis for these two AJEs. *See* Ehrlich Transcript, 67:1 - 78:12. Mr. Ehrlich described how these two AJEs tie back to an Excel spreadsheet calculation AMT used to track the joint venture agreement with Fusion (the "Fusion JV Spreadsheet"). A true and correct copy of that Fusion JV Spreadsheet is attached as **Ex. 34** to the Hartman Decl. Mr. Ehrlich confirmed that the invoice amounts on the Fusion JV Spreadsheet, associated with invoices from 2020 would tie to AJE 4558, and invoices from 2021 would tie to AJE 4568. *Id.* at 76:10 – 78:12.

Mr. Ehrlich described how AJE 4568 and AJE 4558 were recorded in AMT's General Ledger to reflect the revenue and costs-of-good-sold from the joint-venture with Fusion. However, at the same time, Mr. Ehrlich acknowledged that these AJEs were a "mistake" and that many of the same invoices were recorded twice - once as direct invoices in the General Ledger, and then again as part of AJEs 4558 and 4568. *See* Ehrlich Transcript 70:2 – 78:12; 78:23 – 85:9. It appears these AJEs were a "mistake" because the vast majority of revenue reflected on the Fusion JV spreadsheet was associated with revenue already directly recorded in AMT's General Ledger. At the time of Mr. Ehrlich's examination, he acknowledged that to the extent invoices were reflected in both the General Detail *and* the Fusion JV Spreadsheet, such revenue would effectively have been *double counted*. *See* Ehrlich Transcript, 77:20 – 78:12; 86:12 – 18.

### ii. *The 2021 Invoices Double Counted*.

A comparison of the 2021 G/L (**Ex.14,** Sales detail on pp. 26-27) to the Fusion JV Spreadsheet, (5th column, entitled "INV#") reveals that most of AMT's invoices have been recorded twice. Virtually all of the sales invoices reflected within revenue in the 2021 General Ledger are also recorded again in the Fusion JV Spreadsheet. The total 2021 revenue reflected in the Fusion JV Spreadsheet was then booked *again* to revenue, via the $4,431,699 AJE 4568 on 7/31/2021. Aggregating all invoices which appear in both the 2021 G/L Detail and the Fusion JV Spreadsheet, we know AMT has overstated

2021 revenue by at least **$3,340,252**.[10]  *See* 2021 G/L Detail, pp. 26-27 (**Ex. 14**); *see also* Fusion JV Spreadsheet, pp. 2-5 (**Ex. 34**).

### iii.   *The 2020 Invoices Double Counted*.

A comparison of the 2020 G/L report (**Ex.15**, Sales detail on pp. 29-30) to the Fusion JV Spreadsheet, (5th column, entitled "INV#"), similarly reveals a gross overstatement of revenue.  The majority of the sales invoices reflected within revenue in the 2020 General Ledger are also recorded again in the Fusion JV Spreadsheet.  The total 2020 revenue reflected in the Fusion JV Spreadsheet was then booked *again* to revenue, via the $3,313,273.79 AJE 4558 on 12/31/2020.  Aggregating all invoices which appear in both the 2020 G/L Detail and the Fusion JV Spreadsheet, we know AMT has overstated 2020 revenue by at least **$2,077,867**[11].  *See* 2020 G/L Detail, pp. 29-30 (**Ex. 15**); *see also* Fusion JV Spreadsheet, pp. 1-5 (**Ex. 34**).

Given the magnitude of these "mistakes," it is clear AMT's financial records are materially inaccurate, and have grossly overstated revenue.  Having recorded revenue and costs of good sold which do not exist, AMT has also thereby recorded gross margins and eventually profits, over multiple years, which never existed either.  AMT filed its financial statements in this case, under the supposition that creditors and parties in interest could rely on this information, and such information would support rehabilitation of the Debtor.  Having operated this business for approximately 18 years (*See* Ehrlich Transcript at 16:3-6), it is hard to believe Mr. Ehrlich was unaware that AMT's revenue was overstated by such a magnitude.  And if Mr. Ehrlich was actually unaware, this

---

[10]   The following invoices are reflected in both the **2021** G/L report and also the Fusion JV Spreadsheet: 9149, 9157, 9160, 9118, 9117, 9119, 9120, 9121, 9123, 9124, 9125, 9127, 9128, 9129, 9130, 9133, 9134, 9139, 9141, 9143, 9147, 9146, 9142, 9153, 9144, 9145, 9148, 9150, 9152, 9156, 9161, 9162, 9163, and 9164.  These invoice numbers identified with the annotation letter "**A**" in both documents.  The sum of these identified invoices, as reflected in annotations on the 2021 G/L detail is $3,340,252.49.

[11]   The following invoices are reflected in both the **2020** G/L report and also the Fusion JV Spreadsheet: 9149, 9157, 9160, 9118, 9117, 9119, 9120, 9121, 9123, 9124, 9125, 9127, 9128, 9129, 9130, 9133, 9134, 9139, 9141, 9143, 9147, 9146, 9142, 9153, 9144, 9145, 9148, 9150, 9152, 9156, 9161, 9162, 9163, and 9164.  These invoice numbers identified with the annotation letter "**B**" in both documents.  The sum of these identified invoices, as reflected in annotations on the 2020 G/L detail is **$2,077,867**.

reflects staggering ineptitude and unquestionable mismanagement. Either scenario presents independently sufficient cause to convert or remove Mr. Ehrlich as the debtor in possession. Even as Delta was drafting this Motion, AMT amended its Schedules and Statement of Financial Affair ("SOFA") yet again, to finally reflect this gross overstatement of revenue, to which Delta had been seeking answers for months. And only after confronted with these accounting irregularities under direct examination did Mr. Ehrlich finally acknowledge the overstatements and cause AMT amend its filings. AMT's newest SOFA now discloses 2021 and 2020 revenue which has been *reduced* by *$3,521,090* and *$2,087,598*, respectively.[12] A true and correct copy of the second amended SOFA is attached as **Ex. 18** to the Hartman Decl. It is key however to remember that this illusory revenue also still produces illusory profits, and illusory reduction of joint venture liabilities.

### 3. *Accurate Accounting Would Reveal Increasing Insolvency*

Though AMT's historical financial statements reflect positive Net Income in both 2020 and 2021, this profitability is based on materially overstated revenue, and materially overstated gross margins. By way of example, in 2021, AMT's Profit & Loss reflects Total Sales of $8,598,034, Gross Profit [Margin] of $710,661 and Net Income of $278,058. *See* 2021 Profit & Loss at **Ex. 15**. If we account for the inaccuracy of AJE #4568 (discussed above), gross margins and profitability should be reduced by the vast majority of the net income ($395,751) generated through AJE #4568. Rather than profits of $278,058 in 2021, AMT would almost certainly show a loss. The same is true of 2020, in which AJE #4558 books non-existent gross margins of $841,467, most of which is a double counting of revenue. Considering Net Profit for all of 2020 was $659,783, removal of the illusory gross margins ($841,467) from AJE #4558 would similarly eliminate most if not all of 2020's Net Income. *See* 2020 Profit & Loss at **Ex. 17**.

---

[12] AMT's first amended SOFA, filed 10/12/2022 at Doc. No. 48 discloses 2021 revenue of $8,598,034, and 2020 revenue of $6,470,222. AMT's second amended SOFA, filed 3/24/2023 discloses 2021 revenue of $5,076,944, and 2020 revenue of $4,382,624.

Considering AMT's Retained Earnings on 1/1/2020 were actually a Retained Deficit of <$1,936,556> (*see* 2020 Balance Sheet, **Ex. 9**), it seems far more likely that, with accurate accounting, AMT's accumulated deficits would have continued to increase rather than decrease during 2020 and 2021. These misstatements of revenue and profits also provide the most clear and obvious explanations as to why AMT was both insolvent and illiquid on the Petition Date, despite supposed profits in 2020 and 2021.

### 4. *Paying Pre-Petition Debts Without Court Authority*

Delta's claim against AMT arises from advance deposits paid by Delta to AMT for goods which were never delivered. As standard practice, Delta would pay a 20% advance deposit at the time of execution of any Sales Order between Delta and AMT. Thereafter, AMT would typically deliver portions of the total goods described in the Sales Order and provide individual invoices to Delta for the ratable portion of the order being filled. In each invoice, AMT would provide credit for a ratable portion of the deposit paid, corresponded to the portion of the total Sales Order being filled.[13] AMT's invoices and General Ledger detail reveal AMT similarly took advance deposits from various other customers as well.

Two such customers – DS Metals Industry, and Fairmet FZE – similarly tendered pre-petition deposits to AMT at various points in 2022. In contrast to Delta, these customers have continued to do business with AMT after the bankruptcy filing. These two creditors have also erroneously been omitted from AMT's Schedule F. *See* second amended Schedule F at **Ex. 18**, p. 9. Even more concerning, these creditors have been given full credit for the deposits they tendered pre-petition, in connection with post-

---

[13] As a generic example: If Delta were purchasing 10 containers of metal for $100,000, under a single Sales Order, Delta would tender a 20% deposit ($20,000) at the time of execution of the Sales Order. If AMT then shipped five (5) shipping containers, AMT would tender an invoice for those specific five (5) containers, approximately seven (7) days before the containers were projected to arrive. In this example, AMT would send Delta an invoice requiring payment of $40,000. Once Delta had paid this sum, AMT would instruct the shipping company to release the shipment to Delta. The $40,000 invoice amount reflects $50,000 (50% of the total sales order, for one half of the total containers), net of $10,000 in deposits paid (credit for 50% of the total deposit).

---

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 15 of 25

petition purchases from AMT.  In effect, through AMT's post-petition sales, AMT has fully satisfied these pre-petition debts.  And at no point did AMT seek this Court's authorization to satisfy these pre-petition debts.  Details of these transactions are summarized below, with true and correct copies of these four invoices attached as **Ex. 19** to the Hartman Decl.

| Inv# | Customer | Inv. Date | S/O#[14] | Deposit Date | Deposit Applied | Net Inv. Amt. |
|------|----------|-----------|----------|--------------|-----------------|---------------|
| 9171 | DS Metal | **9/22/2022** | 7890 | **1/13/2022** | $51,348 | $118,763.65 |
| 9172 | DS Metal | **9/30/2022** | 7909 | **3/2/2022** | $26,202 | $57,803.20 |
| 9173 | Fairmet | **10/13/2022** | 7915 | **6/24/2022** | $3,200 | $29,966.40 |
| 9174 | DS Metal | **10/31/2022** | 7909 | **3/2/2022** | $26,202 | $78,379.71 |
| **Total Pre-Petition Debt Satisfied** | | | | | **$106,952** | |

Mr. Ehrlich has confirmed the entirety of these transactions in his examination testimony.  He has confirmed that these deposits were received pre-petition, that these invoices reflect post-petition sales transactions, where AMT gave these creditors full credit for pre-petition deposits, and that after payment of the *net* balance reflected on the AMT invoice, AMT then considered these transactions fully complete.  *See* Ehrlich Transcript at 112:13 – 120:22.   Moreover, we can trace these specific pre-petition deposit receipts (utilizing the customer name and Sales Order number), received on the dates indicated above, into AMT's 2022 General Ledger detail.  We can see these deposits were received pre-petition, and thus are debts existing as of the Petition Date.  A true and correct copy of the 2022 General Ledger Detail (from 1/1/2022 – 11/30/2022)(the "2022 G/L Detail") is attached as **Ex. 20**, to the Hartman Decl (*see* p. 19).   And lastly we can trace the receipt of the *net* invoice balances paid on the three DS Metal invoices, as reflected in AMT's October and November Monthly Operating Reports ("MORs").  True and correct copies of the October, 2022 Monthly Operating Report ("Oct. 2022 MOR"), filed at Doc. No. 58 (*see* p. 5), and the November, 2022

---

[14] S/O# is Sales Order Number.

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 16 of 25

Monthly Operating Report ("<u>Nov. 2022 MOR</u>"), filed at Doc. No. 68 (*see* p. 5) are attached as **Ex. 21** and **Ex. 22**, respectively.

  Satisfying pre-petition debts is a violation of the priority scheme under Bankruptcy Code § 507, as well as a violation with regards to post-petition transactions under Bankruptcy Code § 549.  While AMT seeks to pay the remaining unsecured creditors pennies on the dollar (*see* AMT's Chapter 11 Plan at Doc. No. 70), AMT has already fully satisfied $107K in pre-petition debts, to these undisclosed creditors, without notice and without this Court's authority.  This conduct reflects both gross mismanagement of the Debtor's affairs post-petition, as well as a violation of AMT's fiduciary duties to the estate.  A debtor in possession owes a duty of loyalty to the estate. *See Wolf v. Weinstein*, 372 U.S. 633, 649-50 (1963).  Managers of debtors in possession have breached their duty of loyalty in instances where they have engaged in such conduct as making unauthorized payments on account of pre-petition debts (*In re Sal Carusco Cheese, Inc.,* 107 B.R. 808 (Bankr. N.D.N.Y 1989).  Debtors in possession similarly violate the duty of loyalty in instances where they fail to provide "voluntary and honest financial information" to creditors.  *Id*; *See also In re McClure*, 69 B.R. 282 (Bankr. N.D. Ind. 1987).

**B.** **<u>Conflicts of Interest</u>**

  **1.** ***Insider Loan Balance Fluctuates Dramatically***.

  The first transactions to draw Delta's heightened attention in this case related to the large fluctuations of insider loans owed to Mr. Ehrlich in the period prior to the filing of the case.  *See* Creditor's Status Conference Statement, filed at Doc. No. 62, at 2-3.  When such concerns were raised by Delta and the Trustee, and requests for accounting records made, AMT proceeded to alter its historical accounting records to revise these figures.  Below is a table of this insider loan balance, at various points in time, and as reflected in AMT's various business records.

| **<u>Source Document</u>** | **<u>Date</u>** | **<u>Loan Balance</u>** | **<u>*Ref.* (to Hart. Decl.)</u>** |
|---|---|---|---|
| Original Bankr. Schedules | 9/12/2022 | $0 | **Ex. 23**, Doc. No. 24, p. 11 |

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 17 of 25

| | | | |
|---|---|---|---|
| 1 | Original Balance Sheet | 7/31/2022 | $1,487,548 | **Ex. 6**, Doc. No. 1, p. 22 |
| 2 | 2021 Corporate Tax Return | 1/1/2021 | $2,330,158 | **Ex. 6**, Doc. 1, p. 14 |
| 3 | 2021 Corporate Tax Return | 12/31/2021 | $1,525,683 | **Ex. 6**, Doc. 1, p. 14 |
| 4 | 1st Amend. Bankr. Sched. | 9/12/2022[15] | $1,487,548 | **Ex. 24**, Doc. No. 48,p. 11 |
| 5 | Altered Balance Sheet | 9/12/2022 | $551,069 | **Ex. 7**, p. 2. |
| 6 | Altered Balance Sheet | 12/31/2019 | $75,590 | **Ex. 10**, p. 2. |
| 7 | Revolving Line of Credit[16] | 3/1/2018 | $1,094,500 | **Ex. 25**, p. 1. |
| 8 | 2nd Amend. Bankr Sched.[17] | 9/12/2022 | $551,069 | **Ex. 18**, p. 11 |

The insider loan balance fluctuates by millions, with different documents reflecting wildly different values, even as of the same or similar dates. Despite such contradictions, Mr. Ehrlich has vacillated between indicating that the balance reflected on this insider loan was reflected incorrectly in AMT's records, to asserting that each such balance is actually correct at each respective moment in time. *See* Ehrlich Transcript 60:14 – 62:25; 63:4 – 65:4. Furthermore, Delta has been thwarted in its efforts to examine the original transaction history reflected in the insider loan account, because AMT has failed to deliver its original accounting records. Rather than reflecting the normal flow of a loan receipt, followed by regular, consistent loan repayments (which is what one would normally expect to see) for such a loan, AMT's General Ledger detail reflects large lump-sum "adjustments" via highly unusual AJEs. *See* 2020 General Ledger (**Ex. 15**) at p. 28 and 2021 General Ledger (**Ex. 14**) at p. 25.

Even if we assume insider loan balances are *now* correctly reflected in AMT's accounting records, this still means insider loan balances fluctuated more than $2.2M in the years prior to filing bankruptcy. Complicating matters further, in AMT's own Amended and Second Amended Bankruptcy Schedule F, AMT has described these

---

[15] Filed on 10.12.2022
[16] AMT and Mr. Scott Ehrlich appear to executed that certain Revolving Line of Credit Agreement, dated March 1, 2018, in the face amount of $2,000,000, with an outstanding balance of $1,094,500 as of the Effective Date (the "Insider Line of Credit").
[17] Filed on 3/24/2023, more than 6 months into the case.

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 18 of 25

"insider loans" as "Owner Contributions," incurred over the time period of: "various – last 20 years." *See* Second Amended Schedules at **Ex.18**, p. 11.   The document memorializing this obligation – the Insider Line of Credit, executed March 1, 2018 ("Insider LOC") – sets forth in Section 2 that, "Borrower acknowledges that as a result of prior loans made . . . the outstanding balance on the Line of Credit as of the Effective Date is $1,094,500." *See* Insider LOC at **Ex. 25** to the Hartman Decl.  This would imply that these various ad hoc "owner contributions" over the last 20 years were not even documented as a loans at the time the funds were advance, nor does it appear there was any sort of contractual repayment schedule.  These facts raise serious concerns as to the true amounts owed under this "insider loan" to Mr. Ehrlich, as well as the correct classification of such transactions as either loans or owners contributions.

**Mismanagement.**    The contradictions in AMT's tracking and documentation of insider loans reflects a cavalier attitude towards accounting and corporate formalities.  Post-petition, AMT has filed three versions of its Schedule F, each under penalty of perjury, reflecting a balances of $0, $1,487,548, and $551,069 (see table, above).  Delta has little faith even the most recent balance is truly correct.

**Conflicts of Interest**.  Mr. Scott Ehrlich, as designated Responsible Individual for the estate, has an unquestionable conflict of interest in evaluating both the accuracy of conflicting insider loan balances, as well as the classification of said transactions.[18]  Cause to appoint a trustee exists when debtor's management has "significant inherent conflicts" which prevent management from exercising fiduciary duties on behalf of the debtor-in-possession.  *In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003); *In re Sundale*, Ltd., 400 B.R. 890, 900 (Bankr. S.D. Fla. 2009)  *see also In re Eurospark Indus., Inc.*, 424 B.R. 621 629 (Bankr. E.D.N.Y. 2010). "Where the debtor in possession has a conflict of interest in properly investigating and pursing potential fraudulent transfers" or other claims that may benefit the estate,

---

[18]  *See* 11 U.S.C. § 510.

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 19 of 25

conversion is appropriate. *See also In re No Rust Rebar, Inc.*, 641 B.R. 412, 425 (S.D. Fla. 2022) (*quoting Picaho Hills Utility Co.*, 518 B.R. 75, 82). In cases like this, an independent trustee is required to "preserve the integrity of the bankruptcy process and to ensure that the interests of the creditors are served." *SunCruz*, 298 B.R. at 828.

## C. Dishonesty

### 1. *AMT Has Violated Its Fiduciary Obligations by Inflating Its Accounts Receivable Balance In Order to Benefit Guarantor, Mr. Scott Ehrlich.*

Documents produced by AMT confirm that AMT has inflated the value of its Accounts Receivable ("A/R"). In reality AMT likely has $0 in A/R as of the Petition Date. Delta believes AMT inflated A/R in order to support that certain Amended Stipulation for Use of Cash Collateral and for Adequate Protection filed on October 24, 2022 at Doc. No. 54 between AMT and Umpqua (the "Amended Stipulation"), as it relates to an approximately $250,000 secured loan by Umpqua (the "Umpqua Loan").[19] A true and correct copy of the Amended Stipulation is attached as **Ex. 26** to the Hartman Decl. Delta believes this was done because Mr. Scott Ehrlich is a personal guarantor on the Umpqua Loan, and Mr. Ehrlich seeks to have the Umpqua Loan satisfied before other unsecured creditors, thereby reducing his personal liability[20] on this claim. In support of these conclusions, Delta notes the following.

AMT's initial Schedule A/B reflected total assets on the Petition Date of $42,542, the bulk of which was an A/R balance of $30,000. *See* Original Schedules, **Ex. 23**. In conjunction with execution of the Amended Stipulation, AMT amended its Schedules, significantly increasing the value of assets, but principally the value of A/R. After amendment, Schedule B reflects gross A/R of $393,807, and a net A/R of $207,101. *See* Amended Schedules at **Ex. 24**. As Delta sought to investigate the amended A/R balance, AMT was ordered to produce an A/R Aging Summary report as of 9/12/2022 ("A/R

---

[19] *See* Umpqua Proof of Claim No. 4, filed in the instant case. Umpqua has included that certain Commercial Guaranty, executed by Mr. Ehrlich as the guarantor on the Umpqua Loan.
[20] Delta also notes that AMT has never properly disclosed Mr. Ehrlich's personal liability on this obligation in AMT's original or amended Schedule H. *See* **Ex. 23** and **Ex. 24**.

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 20 of 25

Aging Summary"), pursuant to the 2004 Order. The A/R Aging Summary sets forth all the individual customer A/R balances which total to the $393,807 gross A/R reflected in AMT's Amended Schedules. A true and correct copy of the A/R Aging Summary is attached as **Ex. 27** to Hartman Decl. Of this total gross A/R balance, $45,628.53 is classified as "current" and is owed by a single customer - *Marvel* (the "Current A/R"). The remaining $348,179 is described as aged greater than 90 days (the "Aged A/R"). The two largest Aged A/R balances (making up 85% of total Aged A/R) are owed by CN Metal and JEB and total approximately $300,000.

| Customer | Amount | Aging |
|----------|--------|-------|
| CN Metal | $186,706 | > 90 days |
| JEB | $113,991 | > 90 days |

By examining an A/R Aging Detail report as of September 12, 2022 (the "A/R Aging Detail"), we can review the specific transaction detail making up each customer balance reflected in the Aged A/R. A true and correct copy of the A/R Aging Detail is attached as **Ex. 28** to the Hartman Decl. The A/R Aging Detail reflects a total of seven (7) transactions[21] associated with CN Metals, which total to the exact $186,706.68 balance reflected in the A/R Aging Summary. The $186,706.68 balance relates to 4 separate invoices (nos. 8145, 8146, 8156 and 8157), less three (3) payments or credits totaling $44,443.69.[22] What is most surprising is the **dates** associated with these transactions. The invoices are all dated between *May 11, 2015* and *May 15, 2015 –* **almost 8 years ago**. The most recent payment by CN Metals was made on October 15, 2015 – approximately 7.5 years ago. Since that time there has been absolutely no activity on this supposed balance owed by CN Metals.

Similarly, the second largest A/R balance - $113,991 owed by JEB – relates to 8

---

[21] The CN Metals transactions are highlighted in the A/R Aging Detail.
[22] The total of payments: $42,663.16, a deposit of $1,779.01 and a small credit of $1.52, as reflected in the A/R Aging Detail.

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 21 of 25

invoices, the most recent of which is dated *March 31, 2015*.[23] The oldest invoice dates back **more than a decade** – dated *March 2, 2009*. It appears these "receivable" balances are more than just aged – they are *ancient*. They are well past any known statute-of-limitations period, assuming these were viable receivables to begin with. It is also telling to observe that AMT discloses no claims against these customers on Schedule B, nor in its Statement of Financial Affairs. *See* **Ex. 18**. Given all this, it is unsurprising no portion of the Aged A/R has been collected during the six months of this case. *See* February 2023 MOR, attached as **Ex. 29**, p. 12 to Hartman Decl.

Mr. Ehrlich has confirmed as much in his examination testimony, (p. 100:17 – 107:15). In Mr. Ehrlich's testimony, he acknowledged that there has been no collection of the Aged Receivables during the pendency of the case, nor does he expect there to be. In fact, Mr. Ehrlich confirmed he expects no portion of the Aged A/R to ever be collected. *Id.* Moreover, Mr. Ehrlich noted that the goods that were to be delivered to CN Metals weren't ever delivered to CN Metals, but instead were delivered to a different customer. *Id.* 106:20 –107:6.

Further, based on the contractual terms reflected in AMT's sales orders and invoices, it appears all transactions are effectively sold cash-on-delivery. By definition, if goods are not delivered until a customer has paid in full, then A/R never actually exists, regardless of how or when AMT generates an invoice. As noted above, the Current A/R as of the Petition Date is $45,628.53 owed by Marvel, pursuant to a single invoice, number 9170. *See* A/R Aging Detail, **Ex. 28**, p. 1. Examining Invoice 9170, we see payment terms specified as: "Net Cash by TT Remittance Immediately After Presentation of Documents." A true and correct copy of Invoice No. 9170 is attached as **Ex. 30** to Hartman Decl. As confirmed in Mr. Ehrlich's own testimony, "presentation of documents" would be presentation of an invoice for the goods in route to the customer,

---

[23] JEB transactions are highlighted in the A/R Aging Detail. Transactions comprising the $113,991 balance include invoice nos. 5159, 7323, 7458, 7562, 7790, 7853, 7962, and 8099, as well as a small credit memo (#412) for $134.55.

Case: 22-40887   Doc# 101   Filed: 04/03/23   Entered: 04/03/23 21:15:06   Page 22 of 25

and payment would be required *before* AMT would instruct the 3rd-party shipping company to release the goods to the customer.  *See* Ehrlich Transcript (**Ex. 11**) 26:16 – 27:2 and 99:17 – 100:16.  With full payment required before delivery, AMT would never hold any true A/R, and as such, the Marvel Current A/R is not actually A/R.

### The Ehrlich Declaration

This Court, appeared to express hesitancy when AMT amended its asset values in support of the Amended Stipulation, and the Court required AMT to file a declaration in support of these "new" asset values.  A true and correct copy of the Declaration of Scott Ehrlich in Support of Amended Stipulation for Use of Cash Collateral and Adequate Protection, filed at Doc. No. 56 on October 24, 2022 (the "Ehrlich Decl."), is attached as **Ex. 31** to the Hartman Decl.  This Court's hesitation now seems prophetic. Unfortunately, even Mr. Ehrlich does not believe his own Declaration with regards to the value of the Aged A/R, which he acknowledges in his 2004 examination as worthless. *See* Ehrlich Transcript at 103:18 – 105:4; 107:12-15.

It is well understood that a debtor in possession operates as a fiduciary for the bankruptcy estate.  The historical statutory list of "for cause" factors under Bankruptcy Code § 1104 appears nearly identical to that under § 1185 ("including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor"), even as these prescribed factors are determined to be non-exhaustive.  *See* 11 U.S.C. § 102(3) ("In this title . . . 'includes' and 'including' are not limiting").  *See also In re Marvel Entertm't Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998); *In re Madison Mgmt. Group, Inc.*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992).  Cause also exists in instances where a debtor's management has "significant inherent conflicts" which prevent management from exercising fiduciary duties on behalf of the debtor-in-possession.  *In re SunCruz* 298 B.R. at 830 (Bankr. S.D. Fla. 2003); *see also In re Eurospark Indus. Inc.*, 424 B.R. 621 629 (Bankr. E.D.N.Y. 2010).

At best, Mr. Ehrlich has been disingenuous, at worst he has been outright dishonest, in his valuation of AMT's A/R as of the Petition Date.  Mr. Ehrlich filed both

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 23 of 25

Amended Schedules and a Declaration, both of which appear to be false. The circumstances support that Mr. Ehrlich was attempting to minimize his personal liability under the Umpqua Loan. At the same time, Mr. Ehrlich's personal liability on this debt has been omitted from Schedule H (*See* first amended Schedules, **Ex. 24**) and from SOFA, Question No. 4 (*See* second amended SOFA, **Ex. 18**). AMT's actions in this regard constitute a breach of the debtor-in-possession's fiduciary duties to the estate. This situation, alone, constitutes independent cause to either convert this case or remove the debtor in possession.

**D.      Substantial or Continuing Loss, Diminution of the Estate and Absence of Reasonable Likelihood of Rehabilitation.**

In AMT's own Balance Sheets, we see the historical accumulation of Retained Deficits (*see* Original Balance Sheet, **Ex. 6**, Doc. No. 1, p. 22), even before accounting for fictitious revenue and gross margins, discussed above. AMT's (inflated) figures in its last full year of operations (2021) reflect approximately $8.6M of revenue, $7.89M of costs of goods sold and $711K in gross margins. **Ex. 6**. at 21. After deducting operating expenses, AMT is left with net income of only $278K. *Id.* AMT's historical accounting records, even with the admitted inaccuracies do reveal one thing: In order to cover its operating expenses and generate a profit, AMT must generate very large revenue. Revenue has fallen off dramatically since 2021 (when AMT lost Delta as a customer), and as reflected in the table below, AMT is recording net losses every single month during the pendency of this case.

| MOR | Gross Margin | Operating Expenses | Net Loss | Exhibit Ref. |
|---|---|---|---|---|
| Oct., 2022 | 24,841 | <37,275> | <12,393> | **Ex. 21**, p. 10 |
| Nov., 2022 | 29,663 | <56,361> | <26,657> | **Ex. 22**, p. 13 |
| Dec., 2022 | 26,944 | <59,198> | <32,254> | **Ex. 32**, p. 12 |
| Jan., 2023 | 6,735 | <45,390> | <38,655> | **Ex. 33**, p. 13 |
| Feb., 2023 | 18,944 | <40,788> | <21,802> | **Ex. 29**, p. 11 |
| **Totals** | **107,127** | **<239,012>** | **<131,761>** | |

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 24 of 25

Setting aside the double counting of revenue, and countless, material accounting inaccuracies, AMT's entire post-petition operations prove only that AMT has no viable chance of rehabilitation. In fact, month over month, AMT simply accumulates greater losses. The estate continues to diminish, liabilities increase, and AMT's ultimate collapse is inevitable. This case should be converted.

As Delta seeks relief from this Court, it is helpful to remember certain core assertions by AMT throughout this case. AMT has referenced it financial performance – specifically its revenue – to support viability (*See* AMT's [first and only] Status Conference Report at Doc. No. 43, p. 1). AMT has also generically pointed the finger at customers, asserting that it was the failure of customers to pay for goods which caused AMT's financial distress (*Id*. at 2; *See also* Plan of Reorganization for Small Business Under Chapter 11 at Doc. No. 70, p. 2). Neither assertion is true. Revenue and profits have been revealed as grossly inflated. And AMT's historical A/R is exposed as non-existent in this Motion. The real question remains: If AMT actually operates at break even, or at a small loss, and there are is no large outstanding A/R, how exactly has AMT managed to accumulate approximately $2.9M in non-insider debt?

WHEREFOR, for the reasons set forth herein, Delta respectfully requests that the Court enter an Order converting this case to a case under chapter 7, or in the alternative, remove the debtor in possession from control of the estate, or order such other and further relief as is just and proper.


Dated: April 3, 2023

/s/ Kevin Bryans
Manager, Delta Metal (Holdings) Limited

Prepared by:

Dated: April 3, 2023

/s/ Gregory S. Hartman
Attorney for Delta Metal (Holdings) Limited

Case: 22-40887    Doc# 101    Filed: 04/03/23    Entered: 04/03/23 21:15:06    Page 25 of 25